IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : Case Number: 1:11-cr-071-3 |
| | : |
| | : Chief Judge Susan J. Dlott |
| v. | : |
| | : OPINION DENYING DEFENDANT'S |
| TERRANCE WHITE, | : MOTION TO SUPPRESS STATEMENTS |
| | : AND EVIDENCE |
| Defendant. | : |

This matter comes before the Court on Defendant Terrance White's Motion to Suppress Statements and Evidence. (Doc. 368.) With that motion, White moves to suppress any post-arrest statements, asserting that he was subjected to a custodial interrogation in violation of the rights guaranteed to him under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. The Court held a hearing on Defendant's motion, during which, two Drug Enforcement Administration (DEA) Agents, Keith Stamper and Jeremy Nissen, testified on behalf of the Government, and Defendant White testified on his own behalf. Shortly thereafter, the Court issued an Order Denying Defendant's Motions, in which the Court denied Defendant White's Motion to Suppress and noted that the instant opinion expounding on the basis for the denial was forthcoming. (Doc. 419.)

**I.    BACKGROUND**

In this multi-defendant case, Terrance White is charged with one count of conspiracy to distribute and to possess with intent to distribute one kilogram or more of heroin, a Schedule I Controlled Substance, and with one count of use of a communication facility, in this case a telephone, to facilitate the commission of the alleged conspiracy. White was indicted by a

federal grand jury in Cincinnati, Ohio on June 1, 2012 (*see* Doc. 14), and on the same day a warrant was issued for his arrest. On June 20, 2011, White was arrested along with several others at an apartment building on Egan Court in Cincinnati, Ohio by DEA agents. Immediately following his arrest, White was transported to the DEA office in downtown Cincinnati by Agent Stamper, where later he was interrogated by Agents Nissen and John Pearson. White argues that the statements that he made during that interrogation should be suppressed because they were coerced and because he made several requests for counsel that were ignored. The account given by the DEA agents during the hearing on White's motion to suppress differed greatly from the account given by White.

### A. Agent Stamper's Testimony

On the day of Defendant White's arrest, two DEA agents had been monitoring the Egan Court apartment building where the arrest ultimately occurred. When Agent Stamper[1] arrived at the scene, several individuals had already been placed into custody and were lying on the ground. Terrance White had been handcuffed and was standing just inside the front entrance to the apartment building.

Agent Stamper drove White and several others to the DEA office in a transport van. White sat in the passenger seat in the front section of the van with Agent Stamper. According to Agent Stamper, the drive took approximately fifteen minutes, and there was no conversation during that time. Agent Stamper testified that White did not say anything to him and did not ask for a lawyer. Agent Stamper also indicated that he had not seen or heard any other agents speak

---

[1] Agent Stamper has served as a Special Agent with the DEA for approximately eleven and a half years.

to White. When they arrived at the DEA office, Agent Stamper took White to the processing room and transferred him to the care of other agents.

**B. Agent Nissen's Testimony**

Like Agent Stamper, Agent Nissen[2] arrived at the Egan Court apartment building after several individuals, including White, had been placed into custody. When Agent Nissen arrived on the scene, he was told that White had been asking to speak to the lead agent. Agent Nissen told White that he had been indicted by a federal grand jury, that he was in a lot of trouble, and that they would talk later at the DEA office. According to Agent Nissen, White stated that he wanted to do whatever he could do to be released.

Agent Nissen stayed on Egan Court while Agent Stamper transported White to the DEA office. Agent Nissen arrived at the office about forty-five minutes later. By that time, someone had removed White's handcuffs and had placed him in an interview room, a ten foot by ten foot windowless room with one table and four chairs, that was guarded by another agent. Agents Nissen and Pearson both were present for White's interview. With regard to his general experience, Agent Nissen stated that he had interviewed hundreds of people during the course of his work as a DEA agent. He usually takes notes during an interview, and then afterward, he converts those notes into a report using DEA form-6. He made such a report in this case, and the Government submitted the report as an exhibit. (Gov't Ex. 2.)

As is the general practice, before asking White any questions, Agent Pearson *Mirandized* him, reading aloud from an advice of rights card that states the following:

---

[2] Agent Nissen has served as a Special Agent with the DEA for approximately ten years. During that time, he spent seven years in Wisconsin and two years in Colombia before transferring to Cincinnati.

3

## ORAL WARNINGS TO BE GIVEN
## TO A SUBJECT PRIOR TO
## INTERROGATION

Before we ask you any questions, you must understand:

- You have the right to remain silent.

- Anything you say can be used against you in court.

- You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

Do you understand?

Are you willing to answer some questions?

(Gov't Ex. 1.)

Agent Nissen testified that after being advised of his rights, White stated that he understood his rights and wanted to cooperate.[3] (See Gov't Ex. 2 ¶ 3.) Agent Nissen asked White if he knew why he was there, and White responded that it was probably something to do with drugs. The agents then asked White if he was familiar with an individual who went by the name "Peace," a nickname used by Edward Larkins, one of White's co-defendants in this instant case. White responded that he knew Peace and he indicated that he then understood why he had been arrested. That response led to a discussion about White's relationship with Peace, during which White made admissions related to and provided details about a conspiracy to sell heroin.

---

[3] The agents did not ask White to sign a waiver of rights form. Agent Nissen testified that those forms are available to DEA agents who want to use them, but there is no requirement that a subject sign such a form, and Agent Nissen typically does not use them.

White's interview, which was not recorded, lasted approximately one to two hours, and primarily involved only Agent Nissen, Agent Pearson, and White. At some point, a DEA Task Force Officer, Ken Baker, joined Agents Nissen and Pearson for approximately ten minutes while White provided information about various locations in Cincinnati where he claimed drug activity had occurred. According to Agent Nissen, no other officers participated in the interview, although a few officers may have popped their heads into the room on occasion to ask Agent Nissen or Agent Pearson a question. When asked whether White had spoken to any other agents, Agent Nissen stated that he did not know for sure what had occurred when he was not with White. However, no one had told him that they had spoken to White, and prior to Agent Nissen entering the interview room, the agent on guard told Nissen that he had not spoken to White.

During the interview, the agents gave White a soda and a bag of chips.[4] When asked whether White was permitted to use the restroom, Agent Nissen responded that they always permit detainees to use the restroom upon request, and that White never made that request. Agent Nissen also was asked repeatedly on both direct and cross examination whether White ever requested counsel, and each time, Agent Nissen emphatically denied any such claim, maintaining that White never asked for an attorney. Nor did White ask to stop the interview at any time. Rather, Agent Nissen claimed, White appeared calm, relaxed, and willing to cooperate. White stated numerous times that he would help the government if they would release him.

---

[4] As pointed out on cross examination of Agent Nissen, the report he made of White's interview does not reflect that White was given a soda and a bag of chips. Agent Nissen testified that he does not include every detail of what occurs during an interview in the report. Rather, he documents any information that he believes may be important to or in any way related to the investigation. He generally would not include information such as whether the subject was given anything to eat or drink.

5

White specifically suggested that he could participate in controlled transactions that would lead to the recovery of additional narcotics. At the conclusion of the interview, the agents returned White to the processing room, where he waited while the agents interviewed other individuals. Shortly thereafter, at some point during the evening, White was transported to the jail.

### C. Terrance White's Testimony

As stated above, White's version of the events differs greatly from Agents Stamper's and Nissen's versions. White claimed that when he arrived at the Egan Court residence on the day of his arrest, armed agents told him to get on the ground and stated, "You're whole life changed today." One of the agents handcuffed him and moved him to the hallway of the apartment building, where he waited until another agent escorted him to a van. White testified that while he was in the hallway, he asked for an attorney. He was not sure which agent he was speaking to at the time, but he thought it might have been Agent Stamper. White further claims that, in contrast to Agent Stamper's testimony, one of the agents did speak to him after he was placed in the van for transport. Specifically, White claimed that an agent told him that if he wanted to cooperate, this would be his opportunity to help himself. White maintains that he repeatedly asked for a lawyer.

White described a similar scenario after arriving at the DEA office, stating that unidentified agents initially placed him in a holding cell for fifteen or twenty minutes and told him that Larkins had helped himself and that White would have the same opportunity. White then was moved to the interview room, where he claimed he again repeatedly requested counsel only to be ignored by Agents Nissen and Pearson.

White also claimed that his requests to use the restroom and complaints of hunger were

6

ignored. White denied ever being given chips or a soda, and he testified that he asked to use the restroom while he was in the holding cell, but that the agents would not take him to the restroom. White admitted that he never asked Agent Pearson or Nissen to use the restroom, stating that prior to the interview, "the urge went away" and he no longer needed to relieve himself.

With regard to the interview, White testified that Agent Pearson did not in fact advise him of his *Miranda* rights. White maintained that he would have remembered being advised of his rights if that had occurred. However, on cross examination, White testified that he could not remember if he had been advised of his rights during his five previous arrests.

White also contradicted Agent Nissen's testimony about the number of agents who participated in the interview, stating that he believed there was a revolving door of agents, with about four or five people participating in the interview at different times.

Finally, White denied making any admissions about drug sales or his role in the alleged conspiracy. Rather, he claimed that the agents asked him questions as though they already knew the answers, and that all he said to the agents was that he knew Peace, that he and Peace were friends, and that he had planned to help Peace get a car. When asked about Agent Nissen's report documenting various other admissions White allegedly made, White stated that any information in the report that was not incriminating came from him, but that he did not make any of the incriminating admissions.

## II. ANALYSIS

White moves to suppress his statements under both the Fifth Amendment, which protects a defendant from being "compelled in any criminal case to be a witness against himself," and the Sixth Amendment, which provides that "in all criminal prosecutions, the accused shall enjoy the

right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amends. V and VI.

The rights protected by the Fifth and Sixth Amendments are compatible, although not identical. The Supreme Court determined that any suspect subject to a custodial interrogation, regardless of whether formal criminal proceedings have begun, must be given notice of his Fifth Amendment privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). That privilege necessarily includes the right to have counsel present at an interrogation, *id.* at 469-71, as reflected in the standard warning developed by the Court in *Miranda*: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," *id.* at 344.

Unlike the Fifth Amendment, the Sixth Amendment applies only after the initiation of formal criminal proceedings, such as the filing of an indictment. *United States v. Yousef*, 327 F.3d 56, 140 (2d Cir. 2003) (citing *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). Once the Sixth Amendment has attached, the government may not "deliberately elicit" incriminating statements from the defendant without the presence of his attorney. *See United States v. Henry*, 447 U.S. 264, 270 (1980) (outlining the deliberate-elicitation standard).

Neither the Fifth Amendment nor the Sixth Amendment absolutely bars law enforcement from questioning a defendant in the absence of counsel. Rather, such questioning is permitted under certain circumstances where the defendant voluntarily, knowingly, and intelligently waived his right to counsel. *See Miranda*, 384 U.S. at 344 (noting that a suspect who has been advised of his Fifth Amendment rights may waive them, "provided the waiver is made voluntarily, knowingly and intelligently"; *Patterson v. Illinois*, 487 U.S. 285, 292 n. 4, 297-300 (1988)

(applying voluntary, knowing, and intelligent standard in the Sixth Amendment waiver context and holding that the Sixth Amendment does not bar postindictment questioning in the absence of counsel if a defendant waives the right to counsel).

White argues that the DEA Agents who arrested him and subsequently interrogated him violated his Fifth and Sixth Amendment rights by failing to read him a *Miranda* warning and ignoring his request for counsel. White also argues that the Government cannot prove that he knowingly, intelligently, and voluntarily waived his rights prior to his interrogation. The analysis of White's claims largely turns on credibility determinations.

The DEA agents testified that White did not request counsel, that White was read his rights, and that White appeared eager to cooperate. White's testimony was largely a denial of the agents' testimony. For example, White denied ever being read his rights, and he insisted that he would have remembered if Agent Pearson had *Mirandized* him, as Agent Nissen testified. However, White's insistence that on that occasion he would have remembered being advised of his rights does not hold up against his subsequent assertion that he could not, in fact, remember whether he had been read his rights during prior encounters with law enforcement.

Other similar inconsistencies and unbelievable assertions marred the credibility of White's testimony, such as White's explanation that he did not renew his alleged request to use the restroom during his questioning because his need to use the restroom had somehow subsided. Perhaps best representing the tone of White's testimony were his responses to the Assistant United State's Attorney's questions about specific information he gave to the DEA agents: he admitted to providing any information that was not incriminating, but he denied making any statements that were potentially incriminating. Essentially, White would have the Court believe

9

that any assertion made by the DEA agents tending to support the Government's position that White validly waived his right to counsel was a lie. Unfortunately for White, the Court finds little to no reason to doubt the DEA agents' testimony, whereas there are several reasons, as touched upon above, to doubt White's testimony. Therefore, contrary to White's assertions and consistent with the DEA agents' descriptions of White's arrest and subsequent interview, the Court finds that White was advised of his rights and that White chose to waive those rights rather than request counsel.

Having made those factual findings, the only matter left for this Court to consider is whether White's waiver was knowing, intelligent, and voluntary. The Government bears the burden of proving a valid waiver. *Brewer v. Williams*, 430 U.S. 387, 404 (1977). However, to meet the burden, the Government need not present evidence of an explicit statement of waiver by the defendant. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). While there are some circumstances under which there attaches a stricter burden for demonstrating a waiver of Sixth Amendment rights, the Supreme Court has made clear that in the context of postindictment questioning such as that to which White was subjected, the right to counsel guaranteed by Sixth Amendment is no more difficult to waive than the rights guaranteed by the Fifth Amendment. *See Patterson*, 487 U.S. at 297-300 ("[I]t is our view that whatever warnings suffice for *Miranda's* purposes will also be sufficient in the context of postindictment questioning."). Therefore, advising a defendant of his right to counsel by means of *Miranda* warnings generally suffices to ensure that an ensuing waiver is knowing and intelligent:

> As a general matter, . . . an accused who is admonished with the warnings prescribed by this Court in *Miranda* has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights,

10

so that his waiver on this basis will be considered a knowing and intelligent one.
*Id.* at 296 (citation omitted). *See also Montejo v. Louisiana*, 556 U.S. 778, 786-87 (2009) (citing *Patterson*). With regard to the final requirement, that the waiver be voluntary, the court must look to the totality of the circumstances to determine whether the defendant's will was overborne, considering such relevant factors as "the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *United States v. Mahan*, 190 F.3d 416, 423 (6th Cir. 1999) (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)).

The totality of the circumstances in this case demonstrate that White's waiver was knowing, intelligent, and voluntary. The clear and unequivocal testimony of Agent Nissen, supported by his interview report, demonstrates that White not only was advised of his rights, but also that he understood those rights and nonetheless chose to continue the interview with the express desire to cooperate in exchange for favorable treatment. Additionally, the nature of the interrogation was not unduly coercive.[5] The agents provided White with food and a beverage,[6]

---

[5] The Sixth Circuit has established three requirements for a finding that a confession was involuntary due to police coercion:

> (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.

*Mahan*, 190 F.3d 416 at 422.

[6] For the same reasons discussed above when addressing White's credibility, the Court does not believe White's denial that he was given something to eat and drink.

11

did not use physical punishment, and did not question White for an unreasonable amount of time. There was no indication that White, an individual with multiple prior arrests and a lengthy history with the criminal justice system, was overly stressed or that he did not understand the circumstances of his arrest and interrogation. Accordingly, the Court concludes that White validly waived his Fifth and Sixth Amendment rights, and the Court finds no ground to suppress White's statement.

### III. CONCLUSION

For the reasons stated above and as indicated by the Court in its Order Denying Defendant's Motions (Doc. 419), the Court DENIES Defendant Terrance White's Motion to Suppress Statements and Evidence. (Doc. 368.)

IT IS SO ORDERED.

_____
Chief Judge Susan J. Dlott
United States District Court